WILLIAM J. PRICE *vs.* ANN E. HOBBS.

JOHN K. GRIFFIN *vs.* SAME.

DOWER.

*In what Estates the Widow may claim her Dower—When the right to Dower attaches and how Paramount Liens may be created—Doctrine of Equitable Substitution—Construction of Contracts creating Charges upon Real Estate—Right of Widow to Dower (1) as against heir, (2) as against alienee—Rules regulating the assignment of Dower—Statute of 20 Hen. 3, ch. 1—When Widow may recover damages for detention of Dower—May proceed in Equity for an Account of Rents and Profits.*

W. H. and A. H. were married in 1831, and W. H. died in 1874. In 1832, W. R. and M. R. his wife, father and mother of A. H. conveyed in fee to W. H. a tract of land called "Sportsman's Hall." At the time of conveying this property, W. H. the purchaser, executed under seal an agreement with the grantors, to pay $8 per acre for said land, after deducting such parts as had been sold; to pay the whole purchase money equally among the children of M. R., after her decease and upon arrival at legal age; to retain in right of his wife a child's share of the purchase money; not to pay interest during the life of M. R., but to apply annually during her life a sum equivalent to such interest to the use of her and her family; also to reserve for the use of M. R. during her life the use of the dwelling house, kitchen, garden, &c., and if W. R. survive M. R. to retain from the purchase money $1000, and apply the interest thereon to his use during his life; after his death said sum to be distributed as aforesaid; and in case of refusal or neglect to secure to said M. R. and W. R. the money and privileges aforesaid, then to pay to the children at the times specified for the recovery by them of the principal of the purchase money, interest also, and to forfeit the share held by him in right of his wife.

The property passed into the possession of W. H. in 1832, and was held by him until it was sold for his debts in 1844. At the date of the deed, 1832,

M. R. had five children, one of whom died in 1854, without issue. W. R. one of the grantors in the deed died sometime before 1845, and M. R. the other grantor, died in 1870.

In 1837, W. H. made to V. B. a mortgage of the land aforesaid, as indemnity to secure suretyship and to secure his indebtedness to V. B., and in 1844, V. B. became purchaser of the equity of redemption at sheriff's sale on execution against W. H. V. B. then became possessed of the land, and it remained in possession of him and those claiming under him from that time to the present. The land was divided into several parcels and owned by different parties, among whom were the defendants, and much improved by building, &c. before the death of W. H. in 1874.

A. H. the surviving widow of W. H. claimed dower in the lands aforesaid, and in 1875, brought suits against the defendants for the recovery thereof. HELD :

1st. On this state of facts there can be no doubt or question as to the demandant's legal right to dower in the land conveyed by the deed of 1832. There was legal and unconditional seisin in the husband, and that seisin was beneficial and for his sole use. In such case the inchoate right of dower attaches from the vesting of the title in the husband, and becomes consummate on the death of the husband, the wife surviving; and no intermediate conveyance or charge by the husband alone will defeat the wife's right to dower.

2nd. Nor did the contract of W. H., executed at the time of receiving the deed in any way modify or affect his seisin under the deed. The contract created an equitable lien or charge upon the land for the purchase money and also in respect to the privileges reserved for the benefit of M. R., and such lien or charge was in the nature of an equitable mortgage; but the contract did not, like a legal mortgage, divest the legal title and seisin under the deed.

3rd. But the lien or charge thus created, having its inception in the contract of purchase was paramount to the wife's claim to dower; and as against those claiming the benefit of the lien under the contract, she could only claim her right to dower in the surplus, after the full discharge of the lien.

If a subsequent incumbrancer, or purchaser from the vendee, is compelled to discharge the lien of the vendor, he will in like manner be entitled to stand substituted in his place against other claimants under the vendor on the estate, and to have the assets marshalled in his favor.

The doctrine of substitution is of familiar and frequent application in Courts of equity, as a means of doing substantial justice between parties.

In the construction of the agreement entered into between W. H. and the grantors in the deed conveying to him the property known as "Sportsman's Hall," it was HELD:

1st. That the land is not liable for that portion of the purchase money which was reserved to W. H., the purchaser, in right of his wife; and though the wife has survived the husband, she has no claim for that portion of the purchase money, or any part of it.

2nd. The reservation is to the husband himself alone, and not to the wife; and according to the plain meaning of the terms employed, construed in reference to the law as it then stood, in regard to the marital rights of the husband, it is manifest that no right of survivorship in the wife was contemplated.

3rd. If W. H. had retained the land, and on the death of M. R., in 1870, had paid the other children their proportion of the purchase money, it could hardly be contended that the portion reserved to himself would still be a charge upon the land, dependent upon the survivorship of the wife.

4th. At the death of M. R., the proportion of the purchase money that W. H. was entitled to retain was one-fourth; and as from the death of one of the children, in 1854, without issue, W. H. was *personally* discharged from that proportion of the principal of the purchase money, the land stood also discharged to that extent.

As against the heir, there is no question but that the widow is entitled to dower according to the value of the land at the time of the assignment. But as against an alienee, the rule in this country differs from that established in England by the more modern authorities.

In this country the rule is settled by overwhelming authority that as against an alienee, the widow is not to be allowed the benefit of the improvements made by the alienee.

The improved value of the land from which the widow is to be excluded, in the assignment of her dower, as against a purchaser from her husband, is that which has arisen from the actual labor and money of the owner, and not from that which has arisen from extrinsic or general causes.

To give full effect to this rule, after excluding all the improvements made by the alienee, before demand of assignment, the assignment of the dower should be made according to the value of the land at the time of the assignment.

A purchaser under execution occupies the same position in regard to improvements made by him, as if the land had been directly conveyed to him by the husband.

At the common law, when dower was detained from the widow, and she was compelled to resort to her writ of dower, she could recover no damages for the detention, but was entitled only to the profits of her third part of the land from the time of the judgment recovered.

The Statute of Merton, 20 Hen. 3, ch. 1, gave the widow damages equal to her dower from the time of the husband's death, or by construction, from the time of demand made. But that statute by its express terms only applied where the husband *died seized.*

In equity, however, the widow may have an account of rents and profits against the alienee, or those claiming under him, which accrue after dower demanded; and she may even proceed in equity for such rents and profits after she has recovered dower at law.

APPEALS from the Circuit Court for Queen Anne's County.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., STEWART, MILLER, ALVEY and ROBINSON, J.

*John B. Brown* and *E. H. Brown,* for appellants.

These suits have been instituted to recover dower in two parcels of a tract of land called "Sportsman's Hall," owned respectively by the defendants, William J. Price and John K. Griffin. There are two principal questions presented for the consideration of the Court:

1st. Whether or not the plaintiff or demandant is entitled to dower?

2nd. If entitled, to what extent?

There is no doubt about the seisin of W. A. G. Hobbs, the husband of the plaintiff, of the tract in question, but it is contended in behalf of the defendants, that seisin alone of the husband of the plaintiff during coverture, does not confer the dower right. It depends upon the character and quality of the seisin. The wife's dower is but an emanation from the ownership of the husband, and

subject to all its qualifications.   In the present state of
the law, dower springs from the substantial, not the for-
mal ownership of the property.   There is no longer any
magic in the word *seisin,* by which shadow is made sub-
stance and substance shadow.   The legal title is nothing
unless accompanied with beneficial ownership, and benefi-
cial ownership is everything although separated from legal
title.   There cannot be any beneficial ownership in oppo-
sition to permanent encumbrance—there may be in subor-
dination to it.   There is no distinction between a legal
and an equitable encumbrance.   The wife's dower is co-ex-
tensive with the beneficial ownership of the husband, and
cannot be carried further.   2 *Robinson,* (*Virginia State
Report,*) 387 ;  1 *B. Monroe,* 257 ;  *Trustees of the Poor for
Q. A. Co. vs. Pratt,* 10 *Md.,* 11 ; 4 *Kent's Com.,* 50 ;  *Greene
vs. Greene,* 1 *Ohio,* 542 ;  *Lane vs. Gover,* 3 *H. & McH.,*
394 ;  1 *Scribner on Dower,* 531 ;  *McClure, &c. vs. Harris,*
12 *B. Monroe.*

It appears from the record that the plaintiff intermarried
with W. A. G. Hobbs, in the year 1831, that in the year
1832, the said W. A. G. Hobbs received a deed of convey-
ance in fee of the tract of land called "Sportsman's Hall,"
from one William Ringgold and Mary Ringgold, his wife,
the tract being her maiden property.   At the time of said
conveyance, no part of the consideration for said land and
the conveyance thereof had been paid or rendered.

In the year 1844, during the life of the said Mary Ring-
gold, the purchase money for said land remaining unpaid,
and the rights and privileges reserved unto the said Mary
in the said land still outstanding, and the contract of pur-
chase being in full force, the seisin of W. A. G. Hobbs,
the husband, in the tract or farm called "Sportsman's
Hall," was terminated and divested by a sale made by the
Sheriff under a *fieri facias,* issued on a judgment ren-
dered against the said W. A. G. Hobbs, in Queen Anne's
County Court, on the first day of May, 1843—one Valen-

tine Bryan becoming the purchaser of the estate and title of the said W. A. G. Hobbs therein, who, as a matter of course, took the estate "*cum onere*"—that is, subject to all outstanding liens and encumbrances thereon, legal or equitable. *Richardson vs. Stillinger,* 12 *G. & J.,* 477; *Hall, et al. vs. Jones, et al.,* 12 *Md.,* 447; *Martin vs. Martin,* 7 *Md.,* 378; *Spindler, &c. vs. Atkinson,* 3 *Md.,* 423.

If he took it subject to any incipient or inchoate right of dower of the plaintiff therein, he also took subject to the superior and paramount lien for purchase money. Although the purchase may not have imposed upon the purchaser any individual or personal liability unto the vendor, or those entitled under the contract, yet by the purchase he became seized of the land in trust for the vendor and those entitled under the contract, for the amount of the unpaid purchase money thereof, and for the rights and privileges reserved by the original contract of purchase unto the said Mary Ringgold. The dominion and estate of the husband was forever ended and gone. The husband at the time he was disseized, had enjoyed no beneficial ownership in the land, or if he had, only to the extent of the value of the land, over and above the unpaid purchase money thereon, and the value of the rights and privileges therein reserved unto the said Mary Ringgold, *and such beneficial ownership necessarily depended upon future contingencies, and was undefined and uncertain in its character.* If it be true that the dower right of the wife is an emanation from the ownership of the husband, co-extensive therewith, and cannot be carried further, upon what principle can the wife be declared entitled to dower in this land, except in subordination to the paramount and existing lien for purchase money, and the value of the rights and privileges reserved therein to the vendor, at the time his seisin was terminated and divested by the sheriff's sale. This termination or extinguishment of his seisin was not voluntary on his part, it was the act of the law.

True it may be that at the time of this sheriff's sale there was an incipient or inchoate dower right in the plaintiff, but it was only an emanation from the estate of the husband, and could not be carried further, *as uncertain and undefined in its character, as his beneficial ownership in the land had been.* If W. A. G. Hobbs had died at the time of the sheriff's sale, his widow's right to dower would have been subject to all the conditions of this existing original contract for the purchase, and it would have been an impossibility to have measured it : by the sheriff's sale he became *civiliter mortuus* as to this land, and now that he is dead, the widow's dower should be limited to the beneficial seisin which he enjoyed in the land at the the time of this sale, *and if that beneficial ownership was subject to future contingencies, uncertain and undefined in its character and incapable of measurement, her dower right is of like character.* And the widow has no right to complain if this is declared to be the law. The record discloses the fact that he must have been absolutely insolvent at the time of the sheriff's sale. The probabilities are, that if the estate of the husband had not been terminated by the sheriff's sale, it would in all probability have been terminated in some short time by the enforcement of this vendor's lien. He was at no time seized beneficially for his own use, but for the combined use of himself and others, his use being subordinate to that of the others, and while his interest, real or contingent, was not susceptible of any particular ascertainment, but was necessarily uncertain and undefined, his seisin was defeated and terminated and another by judicial process substituted to his estate in the land for those beneficially interested, the sheriff's sale as to Hobbs' beneficial interest substituting the purchaser as the owner thereof. Hobbs had been seized to his own use and that of the others ; the purchaser by the sheriff's sale became seized to his use and that of the others, and Hobbs ceased to have any beneficial interest in the prop-

erty at all. The conveyance and accompanying contract of purchase, were simply the equivalents of a covenant to stand seized for certain beneficial uses or purposes, being as to himself and these others mere equitable interests or estates, and as to himself parted with in his life-time and during the coverture. 2 *Robinson*, and other authorities hereinbefore recited. *McCauley vs. Grimes*, 2 *G. & J.*, 318 ; *Rawlings vs. Adams*, 7 *Md.*, 54 ; *Cowman & Glenn vs. Hall*, 3 *G. & J.*, 398 ; *Lynn vs. Gephart*, 27 *Md.*, 566 ; *Bank of Commerce vs. Owens*, 31 *Md.*, 320.

The existence of the lien at the time of the sheriff's sale is admitted. Its existence and the extent thereof was established first by an opinion and order of the Chancellor, adjudging the rights of the parties to the suit by an account stated in pursuance thereof, and then by the judgment or decree of the Court. In a suit brought in the then High Court of Chancery, in the year succeeding the sheriff's sale, by Mary Ringgold against Valentine Bryan, the purchaser at the sheriff's sale, and afterwards renewed against his heirs-at-law and personal representatives, and wherein the children of Mary Ringgold, referred to in the original contract of purchase, including the plaintiff in this suit and her husband, W. A. G. Hobbs, were also parties, complainants or defendants, the existence of this lien was first adjudged, and afterwards by an account stated and decree of the Court, more formally adjudged and its extent fixed. The decree provided that the unpaid purchase money, and an additional sum, the interest in which would be the equivalent of the value of the rights and privileges reserved unto Mary Ringgold, should be brought into Court on a day named, and in default thereof that the land should be sold for the purpose of raising the amount as ascertained by the decree. And it provided further, that in case of sale, the land should be sold free, clear and discharged of all claim of the parties to the suit, and of any and all claiming by, from or under them,

or any of them.   All this took place after the seisin of
the husband had been defeated by the sheriff's sale.   It
took place in a proceeding directed expressly and solely
against the land in the hands of the purchaser.   The
vendor's lien became merged in the judgment or decree
of the Court possessing the same paramount character
as the lien itself had possessed.   The plaintiff and her
husband were, because of their connection with and rela-
tion to the original contract of purchase, necessary par-
ties to this suit.   All parties to the suit acquiesced in
its binding force and effect.   The plaintiff, now bringing
her suit for dower, admits the sheriff's sale and the
validity thereof; admits the contract of sale, the vendor's
lien and the suit in chancery; that she was a party to
the suit; the recovery of the decree; the various steps
that were taken in the suit after the opinion of the Court
and reference to the auditor to state an account that were
taken with her concurrence and consent, as appears by the
various exhibits presented by the record.   If we under-
stand aright, she is even now seeking to recover a child's
portion under the original contract and the decree passed
in the cause, or failing in that, a child's portion of what
would have been Augusta Pratt's portion had she survived
her mother.   Being a necessary party to this suit in chan-
cery, she is absolutely estopped to deny its binding force
and effect on the said Valentine Bryan and those claiming
under him.   Claiming at this date, however erroneously,
benefits under the contract of sale and the decree in chan-
cery, how can she in equity and conscience avoid its full
force and effect?   The mere creature of equity has become
a judgment or decree of a Court of competent jurisdiction,
with all the incidents which attach thereto.   It has
become transferred into the peremptory demand of the
law, which no man can with impunity gainsay or resist.
The question here presents itself: Is a party who pur-
chases a tract of land at sheriff's sale, subject to an out-

standing lien, when thus confronted with the mandate of
the law, *"pay the amount of this decree within such a time,
or else your property shall be sold,"* bound to submit to a sale
of his property, in order to protect himself against subordi-
nate liens, or incipient or inchoate rights, which are subject
and subordinate thereto? A rule like this might perhaps
be applicable to a person voluntarily purchasing from the
husband, who afterwards voluntarily pays off and procures
to be released a paramount lien, but we cannot see how or
why such a rule should be applied to a party who, pur-
chasing at sheriff's sale, and resisting the application for
a recovery by all the means in his power, is forced by the
judgment and decree of a Court of competent jurisdiction
to pay off a lien or else submit to a sale. It is admitted
that a sale would have abolutely defeated dower in this
land: a sale might have created no surplus out of which
the widow might have been endowed when the time
arrived. Why, if the party should have been unwilling
to have submitted to a sale, should his yielding to the
mandate of the Court have the untoward effect of saddling
him with the burden of subsequent and subordinate liens,
to the one he has been forced to pay off. He pays under
duress of the law, and the law should protect him in
acting in obedience to its peremptory mandate, by pre-
serving to him the benefit of the lien, which it has forced
him to pay, and substituting him to the ownership
thereof. Why should payment, made after the seisin of
the husband has been terminated and divested by judicial
process, enure to the benefit of the wife in any case?
You take the matter of improvements, made after his
estate has terminated, and the law gives her no dower in
these, *because if the husband had never aliened he might not
have made these improvements, and it would affect the pros-
perity of the country, by discouraging improvements in
building and agriculture, if the wife were to be endowed of
one-third of the value including these improvements.* 5 *Serg.
& R.,* 289.

Do not both of these reasons apply with equal force in the case of land sold at sheriff's sale subject to a vendor's lien, the husband might never have paid, and it is not promotive of the interest of the business and agricultural community that a purchaser at sheriff's sale should be compelled to submit to a sale in order to protect himself from a demand for dower? It is true all the payments were not made at the time or within the period prescribed by the decree, but it is equally true that they never would have been made at all but for the decision of the Court and the mandate of the decree, and the threat contained in it in case of failure to pay. The postponement of the period of bringing in the money, and of payment, was a matter of arrangement in which the plaintiff participated, and in all which she could not have acted in the interests of her husband, but in the interests of her mother, and in obedience to filial duty. Payments were made at her instance and by her written consent, other payments were postponed to a future day by the same consent, and it should not be in the power of the plaintiff to take advantage of her own act. It would be a fraud on the rights of those claiming under the sheriff's sale to permit her to do so. But for this arrangement a sale might have been submitted to, and then where would have been the dower rights in the lands? The party paying was permitted to exercise no option in this case—he was forced to pay: in order to enable the widow to claim dower, it is certainly no hardship on her to *compel her to contribute her share of lien and decree debt, or to make a proper statement on account thereof.* 3 *Md.*, 423 ; *Martin vs. Martin,* 7 *Md.,* 578 ; *McKenzie vs. Balt. & Ohio R. R. Co.,* 28 *Md.,* 161 ; *Homer vs. Grosholz & Coquentin,* 38 *Md.,* 520 ; *Clemens vs. Clemens,* 37 *New York,* 59 ; *Le Quee vs. Gouverneur,* 1 *Johns. Chancery Cases,* 436 ; *Vartu vs. Underwood,* 18 *Barbour,* 561.

Suppose, however, that the Court should determine that the plaintiff is entitled to be endowed in the two parcels of land called "Sportsman's Hall," owned respectively by the defendants, subject to the amount received under the judgment of the Chancery 'Court, on account of the contract of purchase, how is the extent of this recovery to be ascertained and measured?

We think it can only be done by ascertaining what would have been the probable market value of the land in the month of September, 1874, when W. A. G. Hobbs died, supposing it to have continued in the same condition it was in at the time of the sheriff's sale in the year 1844.

The plaintiff is not entitled to be endowed in the enhanced value of the land arising from the outlay and expenditure of the labor and money of the purchaser at sheriff's sale, and those claiming under him.   She is entitled to be endowed in any enhanced value arising from extrinsic causes, affecting property generally in the neighborhood.   (See *Scribner on Dower, vol.* 2, *sub-title.*   "The rule in the United States . as to improvements by an alienee.")   (*Page* 573, *&c., also do., sub-title.*)   "Increase in value arising from extreme causes, and authorities cited."   (*Page* 586, *&c.*)

She is not entitled, in ascertaining the probable value of the land, to any allowance for buildings or other improvements which were upon the land at the time of the sheriff's sale, but which had gone out of existence previous to the death of W. A. G. Hobbs.   See *Scribner on Dower,* 2 *vol., page* 594, *sub-title, Deterioration, &c., page* 594.

All the buildings which were upon the tract at the time of the sheriff's sale, were then in a ruinous and dilapidated condition, or of a temporary character.   In the natural course of things they had ceased to be in the period of thirty years elapsing between the sheriff's sale and the death of Hobbs.   The price fixed upon the land in 1832,

when Hobbs received the conveyance, was eight dollars per acre, subject to the value of the privileges reserved to the grantors, which in the case of *Ringgold vs. Bryan,* were estimated at $60 per annum.   Estimating the value of the tract as it then existed and according to its real contents, 388 acres 2 roods and 33 perches, and we have the price value of it, $4109.65.   W. A. G. Hobbs in the interim between his purchase and the sheriff's sale in 1844, seems to have done very little towards the improvement of the land.   The dwelling had grown older and became dilapidated.   The enhanced value of this land at the time of the sheriff's sale must have arisen in great measure from extrinsic causes.   The testimony of the witnesses fixes it at about $15 or $16 per acre.   At $16 per acre in 1844, the time of the sheriff's sale, the total value of the whole tract would have been $6219.75.   At the time of W. A. G. Hobb's death in September, 1874, the probable market value of the land in the same condition it was in during the year 1844, would not have exceeded the sum of $16 per acre, and in the same condition as to the soil and without buildings, its probable market value would have been less than $16 per acre.   W. A. G. Hobbs died at a period when real estate in Queen Anne's county was very much depressed, and it still continues so.   Land was then selling very low, land for which $60 and $70 was offered during the war, was selling with difficulty at $25 and $30 per acre, improved land at that, and with valuable buildings upon it.   According to the testimony of the witnesses, about $16 per acre would have been about the probable value in 1874 of this land, in the same condition as it was in 1844, when the sheriff's sale took place.   Taking the tract as containing 388 acres 2 roods and 33 perches, and estimating the probable market value thereof at $16 per acre, and then deducting therefrom the amount recovered in the chancery suit of *Ringgold vs. Bryan,* and then deducting therefrom such portions of the land as have been sold off and are not

embraced in this suit, and then adding to the result, the proportion of the original purchase money to which Valentine Bryan and his heirs-at-law became entitled by the sheriff's sale, and one-third of the result would give the utmost extent to which the plaintiff could claim dower in these two parcels of "Sportsman's Hall," to be reduced to land at the present price or value thereof per acre. She is entitled to no part of buildings on said land.

*Thos. J. Keating* and *B. P. Keating,* for appellee.

The appellee contends, that both at law and in equity, she is entitled to dower in the parts of "Sportsman's Hall," now owned by the respective appellants. The appellee's husband, Hobbs, by the deed from Ringgold and wife, of February 2nd, 1832, acquired the legal title in fee to the land, and having taken possession thereof, became seized both in law and in fact, prior to the sale of his interest by the sheriff; and the price paid at that sale for his interest by Bryan, with knowledge of the facts, clearly indicates that interest to have been of a substantial and beneficial character. Besides, his right and title was such, that by the joint deed of himself and wife, he could have transferred to a purchaser, without notice of his outstanding contract of purchase, a full, free, unencumbered and absolute estate in the land. His children by the marriage might by possibility have inherited the entire estate.

He certainly, if he were seized of anything under his purchase, was seized of an estate of inheritance, which at law was absolute and complete, and which could only be disturbed to the detriment of the appellee's dower by a sale under proceedings in equity upon his contract of purchase. The estate and seisin of the husband during the marriage, being then such in law as to entitle the appellee, his widow, to her dower at law in the lands mentioned, and having sought her remedies in a Court of law, is

there anything in the record to enable this Court to discover and consider any equitable defence or bar, or set-off to her actions? The judgments in the Court below are *pro forma,* and the agreement of counsel invites this Court not only to review these judgments, but also to finally adjudicate all questions of right and interest between the parties, arising out of the record, either at law or in equity.

A vendor's lien and a decree to enforce it, obtained in the High Court of Chancery on the first day of May, 1851, against those from whom the appellants claim title, are relied upon to defeat the appellee's claim. That dower is subject and subordinate to a subsisting vendor's lien for purchase money, is conceded; and even, as in this case, where the vendor parts with his legal title to the land, if he does so without any waiver of his lien, the current of American authorities seems to subordinate the dower of the vendee's widow to the lien of the vendor or his assignee. 1 *Bishop on the Law of Married Women, sec.* 328, *and note* 5, and cases there referred to; 1 *Hilliard on Mortgages, chap.* 23, *sec.* 28, *(4th Ed.,) page* 687. But this lien, like any other prior lien, merely takes precedence of the dower.

Subject to it, and against all others but the vendor or his assignee, the inchoate dower of the wife of the vendee attaches. *Rawlings vs. Lowndes,* 34 *Md.,* 639 ; 1 *Washburn on Real Prop., marginal page* 182, *(3rd Ed.,) page* 212. It is a lien of such a nature that it cannot be transferred except by express assignment—it will not pass by implication or construction. *Watson vs. Bane, et al.,* 7 *Md.,* 117. If the alienee of the husband yields to the demand of the husband's vendor, and pays it to protect his own estate, it does not, like a mortgage, by equitable assignment, pass to him and remain as a protection to him against the subordinate dower of the husband's widow, but it requires a formal transfer to keep it alive. If it

was waived, or paid or extinguished during the life-time of the husband, at his death his widow succeeds to full dower, as if it had never existed.

There is no pretence of any express or formal assignment of this lien, or of the proceedings to enforce it, set up by the appellants. If the lien were a mortgage, and if to the extent to which payments have been made upon it by Valentine Bryan or his heirs or personal representatives, an equitable or implied or a constructive assignment of it were claimed for the Bryans, and through the Bryans by the appellants, the circumstances under which Valentine Bryan bought the property, the subsequent assumption of the debt by his personal representatives in consideration of forbearance, and the ample security obtained from them by Mr. Brown's decree of January 30th, 1872, the notice or knowledge under which the appellants acquired their title to the land, and the indemnity which the appellant, Price, the purchaser of the last parcel, has upon other lands, would all militate against any such claim, and place this case among that class referred to in 1*st Washburn on Real Property, marginal pages, from* 182 *to* 188 *inclusive,* in which the widow was adjudged her full dower as though a mortgage had never existed. Valentine Bryan, and his heirs and representatives, in the proceedings against them to enforce the vendor's lien, are made to figure largely in this record, and are sought to be made available by the appellants in their resistance to the appellee's demand.

Valentine Bryan, whose estate and rights the appellants claim to represent, purchased the interest of Hobbs in the land at sheriff's sale, with notice of this outstanding claim for purchase money, and subject to it. He therefore, and solely because of this notice, purchased *rem cum onere,* and assumed *onerem cum re.* It was his knowledge of the lien that continued its existence after his purchase, and that imposed upon him, and his heirs and their

alienees, the obligation to pay the debt or to let the land be sold for that purpose.

They have chosen the former alternative, and that choice determines where the appellee must look for the dower.

Hobbs, the vendee of the Ringgolds, in his contract of purchase, reserved to himself, in right of his wife, the appellee, her part of the purchase money. If Hobbs had the right, under the terms of this contract, and the relations the parties in interest sustained to it and to him, to take this reservation to himself, then one child's part of the debt was extinguished as soon as it was created. Mrs. Pratt, one of the children, died in the year 1854, intestate and without issue, and her portion survived to the remaining children; all of whom, except Mrs. Hobbs, have been paid their full portions of said debt.

It appears, then, that unless the appellee, Mrs. Hobbs, who has not been paid any part of this purchase money, is entitled to collect and receive a portion of it, (and what portion, if any, she can collect is for this Court to determine,) so far at least as the vendors, and those claiming an interest in the purchase money by the contract of purchase, are concerned, the debt is paid, the decree against the land is satisfied, and the vendor's lien is extinguished. Besides, of the purchase money that has been paid, not one dollar has been contributed by the appellants, or by either of them; and if there is any yet to be paid, and the enforcement of its payment can be made by the decree of May 1st, 1851, this burden can, and of course will be, saddled upon that part of the land bought by the appellant, Price, the last purchaser, who, it will be observed, purchased, *cum onere,* and sought protection in an agreement which he afterwards contravened for an indemnity upon other lands owned by J. B. Brown; the said Brown being amply secured for the payments that he has made, and for any hereafter to be made by his decree of January 30th, 1872, against the personal representatives of Valen-

tine Bryan; and the personal representatives of Bryan having, in consideration of forbearance, assumed the payment of this entire lien upon "Sportsman's Hall," by agreement with the trustee, McLane, and the parties in interest. By what principle then of law or equity, can these appellants, or either of them, avail themselves of a vendor's lien as a plea in bar or set-off to the appellee's demand? Where and in whom and to what extent did the vendor's lien exist at the death of Hobbs in 1874, when the dower right of the appellee was consummate, and before which all these occurrences took place?

It had been extinguished, or paid or waived by substituting other securities, and is therefore as if it had never existed. The appellants seek further to deprive the appellee of the benefits of the improvements placed upon the land since the sheriff's sale to Valentine Bryan. The doctrine that the widow shall not be endowed of the buildings and other like improvements put upon the land by the alienee of the husband, is laid down in some of the old English authorities, and although it does not now prevail in England, it has been revived and approved by Chancellor KENT and others in this country. It was followed by Chancellor JOHNSON in the case of *Bowie vs. Berry,* 1 *Md. Ch. Dec.,* 454; 3 *Md. Ch. Dec.,* 360; but it has never received the sanction of the Court of Appeals of this State. On the contrary, this Court in the case of *Sellman vs. Bowen,* 8 *G. & J.,* 50, in decreeing rents and profits to the widow against the alienee of the husband, directed that they should be estimated according to the improved value of the premises from the time the improvements were made.

As these rents and profits were nothing more or less than the representatives of her dower, this Court in the case referred to, have rather sanctioned the present English rule than the current of American authorities upon this subject. *Sellman vs. Bowen,* 8 *G. & J.,* 50; *Alex-*

*ander's British Statutes, page* 25; *Washburn on Real Estate Property, vol.* 1, *bk.* 2, *ch.* 19, *secs.* 341, 342, 343.

But even should Chancellor KENT's rule prevail here, the appellants will find some difficulty in its application to this case. There is no feoffment with warranty in this case, no adjustment of equities to be made between the widow and the feoffee and the heirs of the husband. Valentine Bryan purchased at a forced sale; he is in this connection, at least, no alienee of Hobbs; his son, John C. Bryan, elected to take the land valued expressly by the commissioners, subject to the inchoate dower of the appellee; the appellants purchased with knowledge of his title, and improved the land at their own risk. They are all volunteers and the legal consequences of their acts must follow them. There are no special equities in their case to shield them.

The appellee is not estopped from claiming her dower in these suits by the decree of the Chancellor, and her participation in the proceedings in the case of *Ringgold vs. Hobbs, et al.* Even a sale under that decree would not have defeated her dower, but would only have transferred her claim to the surplus funds. There has been no sale and there are no proceeds of sale to look to. Where then can she look but to the land? She was a party to those proceedings, not as the wife of Hobbs, but as one of the children of Mrs. Ringgold. Her right to dower was not raised and not questioned. How then is she estopped from doing that which she has never done before?

If the views above expressed are correct, the questions in regard to the amount of the vendor's lien, and the value of the land and of the improvements, have but little pertinence to the issues in these cases. And in any event they are mere matters of fact, and are submitted by the appellee to the judgment of the Court.

ALVEY, J., delivered the opinion of the Court.

The two cases embraced in the one record before us were actions of dower, instituted by the appellee against the appellants, to recover dower in lands of which it is alleged the husband was seized after his marriage with the demandant, but which were alienated in his life-time. By agreement, judgments were entered *pro forma* in the Court below, in favor of the demandant, for dower in the lands described in the declarations; and it is from such judgments that appeals have been taken.

By the agreement under which the *pro forma* judgments were entered, it is provided "that an appeal shall be forthwith entered on behalf of the defendants, and that the said cases shall be forthwith carried to the Court of Appeals for review of said judgments, and for final adjudication of all questions of right and interest between the respective parties to said suits, arising out of the pleadings, evidence and statement of facts; and in order to make such judgment final, the Court of Appeals shall have full power and authority to consider and pass upon any claim on the one side, or defence on the other, arising out of the pleadings, evidence and statement of facts in the respective cases, that might be legally and successfully set up or pleaded, *either at law or in equity.*"

These actions being actions at law, of course, no consent of parties can confer power or jurisdiction on this Court to review the judgments therein, and determine the rights of parties upon any other principles than such as properly apply to such actions, and which the Court below would have been authorized to make the rule of its decision. Otherwise, it would be in the power of the parties to a cause, by their mere agreement, to confer original jurisdiction, where the Constitution and laws have conferred appellate jurisdiction only. The jurisdiction of this Court is one solely of review, and the consent of parties cannot clothe it with power, on an appeal from a judgment at law,

to convert the action into a bill in equity, and so shape and form the proceedings as to give force and effect to principles exclusively of equitable cognizance. It is a well established maxim that consent of parties will not confer jurisdiction on a Court, where no jurisdiction exists without such consent. *Bents vs. Graves*, 3 *McCord*, 280 ; *Overstreet vs. Brown*, 4 *McCord*, 79 ; *Lindsay vs. McClelland*, 1 *Bibb*, 262.

But notwithstanding that the specific questions for review are not properly presented, and the judgments which may be rendered in these cases can only be in respect of the legal rights of the parties, we shall, in view of the agreement, and in order to avoid delay, cost and further litigation, if possible, express an opinion as to the rights of the parties, *both legal and equitable*, upon the facts before us; the equitable rights thus determined to be accepted by the parties as modifications of the legal rights determined in the judgments, and thus give effect to the terms of the agreement.

According to the statement of facts agreed on, William A. G. Hobbs and the demandant were married in 1831, and the former died in the year 1874. In 1832, William Ringgold and Mary his wife, being the father and mother of the demandant, executed and delivered to William A. G. Hobbs a deed for a tract of land called "Sportsman's Hall." This land belonged to Mrs. Ringgold, the mother of the demandant, having been devised to her by her father John L. Blake. The deed conveyed the land absolutely and in fee-simple. At the time of making this deed, that is to say, on the second of February, 1832, Hobbs, the purchaser, executed under his hand and seal, the following agreement:—" I have purchased of Wm. Ringgold and Mary Ringgold, his wife, the farm called 'Sportsman's Hall,' which was devised to the said Mary Ringgold, by her father, John L. Blake, and am to pay eight dollars an acre for said land, after deducting such parts thereof as

have been heretofore sold. The whole purchase money is to be paid by me equally among the children of the said Mary Ringgold, immediately after her decease, and upon their arrival at legal age; and in case of the death of either or any of said children without legal issue, then the portion of such deceased child to be equally divided among the survivors; and I am to reserve to myself a child's part of such purchase money in right of my wife. The said purchase money is not to bear interest during the life of the said Mary Ringgold, but I am to apply annually, during her life, a sum equivalent to such interest, to such purpose as I may think most useful to her and her family. I am also to reserve for her use, during her life, the dwelling-house, kitchen, meat-house, poultry-houses, and garden on said farm, with the privilege of getting fire-wood, of pasturing four head of cattle, and of raising any kind of poultry, except turkeys. And if the said Wm. Ringgold should survive his said wife, then I am to retain in my hands one thousand dollars of said purchase money during his life, the interest of which is to be applied by me in such manner as I may think most to his advantage; the said sum to be distributed as above mentioned after his death; and if I should refuse or neglect to secure to the said Mary Ringgold the annual sum and the privileges above mentioned, and to the said Wm. Ringgold the interest above mentioned, after the death of his wife, it is understood, and I hereby agree to pay to the children of the said Mary Ringgold, at the times specified for their receiving the principal of the purchase money, interest on the sum from the first day of January last, and to forfeit such portion of said purchase money as I should be entitled to in right of my wife."

The consideration expressed on the face of the deed as having been paid, is $3000. The land passed into the possession of Hobbs and he held it until it was sold for his debts in 1844. At the date of the deed and contract Mrs.

Ringgold had five children, including Mrs. Hobbs ; one of whom, Mrs. Pratt, died in 1854, without issue.   William Ringgold, one of the grantors in the deed, died sometime before the year 1845, and Mrs. Mary Ringgold, the other grantor, died in the early part of the year 1870.

In the year 1837, Hobbs made to Valentine Bryan a mortgage of the land embraced in the deed from Ringgold and wife, as indemnity for suretyship, and to secure a certain indebtedness to the mortgagee ; and on the 14th of September, 1844, Bryan, the mortgagee, became purchaser of the equity of redemption in the land at sheriff's sale, made on execution against Hobbs ; the judgment upon which the execution issued being subsequent to the date of the mortgage.   Bryan, the purchaser, became possessed of the land from the time of the sale, and from the time of his death, in 1848, to the present, it has remained in the possession of those claiming under him.   The land has been divided into several parcels, and is now owned by different parties, and it has been considerably improved by the erection of buildings and otherwise, before the death of Hobbs, in 1874.

1. On this state of facts, there can be no doubt or question as to the demandant's legal right to dower in the land conveyed by the deed of the 2nd of February, 1832.   There was legal and unconditional seisin in the husband, and that seisin was beneficial and for his sole use.   In such case, the inchoate right of dower attaches from the vesting of the title in the husband, if acquired after marriage, and becomes consummate on the death of the husband, the wife surviving ; and no intermediate conveyance or charge by the husband alone will defeat the wife's right to dower.

Nor did the contract of Hobbs, executed at the time of receiving the deed, in any way modify or affect his seisin under the deed.   The contract created an equitable lien or charge upon the land for the purchase money, and also in respect to the privileges reserved for the benefit of Mrs.

Ringgold, and such lien or charge was in the nature of an equitable mortgage ; but the contract did not, like a legal mortgage, divest the legal title and seisin under the deed. The lien or charge, thus created, having its inception in the contract of purchase, was paramount to the wife's claim to dower ; and as against those claiming the benefit of the lien under the contract, she could only claim her right to dower in the surplus, after the full discharge of the lien. *Moreton vs. Harrison,* 1 *Bland Ch.,* 499, 500 ; *Ellicott vs. Welch,* 2 *Bland Ch.,* 242 ; 1 *Scrib. on Dow.,* 530–533. That this contract constituted a lien or charge upon the land, has been expressly adjudicated, as appears from the case of *Ringgold vs. Bryan and others,* 3 *Md. Ch. Dec.,* 488, to which the demandant and her husband were parties.

2. In the case just referred to, Mrs. Ringgold, in 1845, after the death of her husband, filed a bill in the High Court of Chancery against Bryan, the purchaser of the land, and others, for the enforcement of the contract of Hobbs, proceeding upon the ground that the land had been purchased by Bryan with notice of the contract, or if not with actual notice, that there were circumstances sufficient to put him on inquiry ; and the Chancellor so decided. The case was referred to the auditor, and an account was stated of the purchase money owing, with the interest thereon, and also of the value or equivalent of the privileges reserved for Mrs. Ringgold on the land. This account was finally ratified ; and in the final decree ratifying the account passed in 1851, the amounts ascertained were directed to be brought into Court by a given day, and in default thereof that the land should be sold. Before this decree was passed Valentine Bryan had died, and his heirs had been made parties to the cause, and his real estate had been partitioned ; and John C. Bryan, one of his children and heirs-at-law, had elected to take "Sportsman's Hall," at a valuation. The present defen-

dants derive title immediately through John C. Bryan, deceased, or his devisees. It appears that Mrs. Ringgold was fully paid the interest of the purchase money down to the time of her death, and also the annual value of her privileges reserved on the land; and that all of the purchase money due on the land, except one-fourth part thereof, has been paid to the three surviving children of Mrs. Ringgold, other than the demandant, and they make no further claim. This money, thus paid, was paid by or for the heirs and distributees of Valentine Bryan, by an arrangement among themselves, and in exoneration of the land which had been decreed to be sold.

Now, as we have already said, the lien or charge created by the contract, was paramount to the demandant's claim to dower in the land : and as the heirs of Valentine Bryan have been required to discharge the lien, it is but fair that they should be substituted to the place of those who have received the money. It is very certain, if the land had been sold under the decree, it would have been sold free and clear of all claim of the demandant to dower in the land : for the decree, in express terms, declared that the land should be sold free, clear and discharged of all claims of the parties to the cause, and of all persons claiming by, from or under them ; and the demandant and her husband were parties to the cause. In the event of sale under the decree, she could only have claimed dower in the surplus proceeds, after discharging the lien, and all the expenses attending the proceedings and the sale. She contributed nothing to the exoneration of the land, and there is no reason, therefore, why she should be better off, and the parties paying the money worse off, because the land was redeemed rather than allowed to be sold for the satisfaction of the lien. There was no personal obligation on Valentine Bryan, or his heirs, to pay off the lien, and the decree created none; the personal obligation was upon Hobbs, with the superadded security by way of lien upon the

land; and the main object of the decree was to enforce the lien specifically.

In 2 *Sto. Eq. Juris.*, sec. 1227, the law is stated to be that "if a subsequent encumbrancer, or purchaser from the vendee, is compelled to discharge the lien of the vendor, he will in like manner be entitled to stand substituted in his place against other claimants under the vendor on the estate, and to have the assets marshalled in his favor." And the same principle was distinctly applied by the Chancellor in the case of *Bowie vs. Berry*, 3 *Md. Ch. Dec.*, 359, 364, in passing upon a question of the right to dower. In that case Bowie, the husband, had purchased a tract of land during marriage, and sold it to Berry before he had paid all of the purchase money. Berry paid a certain sum on his purchase to Bowie, who applied it to the payment of the purchase money due to his, Bowie's, vendor; and the Chancellor, in speaking of the application of this payment made by Berry, said that it should be deducted from the value of the land, as ascertained at the death of Bowie, before the dower, or its equivalent, was awarded the complainant. "To that extent," continued the Chancellor, "I regard the defendant as occupying, by substitution, the place of those who sold it (the land) to Bowie; and as the dower claim could not be enforced to their prejudice, so neither can it as against Berry, so far as he stands, by substitution, in their shoes."

The doctrine of substitution is of familiar and frequent application in Courts of equity, as a means of doing substantial justice, and but few cases could be suggested more strongly requiring its application than the present. The amount of money, therefore, paid by or for the heirs of Bryan, under the decree, and in discharge of the lien upon the land, should be deducted from the value of the land as of the time when the value is ascertained for the purpose of having the dower assigned, and before assignment;

the claim to dower applying only to the residue after such deduction.

3. The next question that arises is one of construction, and that is, whether, under the contract of the 2nd of February, 1832, the land is liable for that portion of the original purchase money which was reserved to Hobbs, the purchaser, in right of his wife; or, in other words, whether the wife, having survived her husband, has any claim as against the land, for that portion of the purchase money, or any part of it?

This question was left open by the decree in the case of *Ringgold vs. Bryan and others,* and it is now supposed that Mrs. Hobbs is entitled by right of survivorship. We are clearly of opinion, however, that the claim is not well founded.

By the contract, Hobbs stipulated to pay the whole purchase money, immediately after the death of Mrs. Ringgold, to her children equally, upon their arrival at age; and in case of the death of either of the children without legal issue, the portion of such deceased child to be equally divided among the survivors; *he, however, reserving to himself a child's part of such purchase money in right of his wife.* This was matter of agreement between the parties, and Mrs. Ringgold, the owner of the land, had the perfect right, with the consent of her husband, to say how the purchase money should be disposed of after her death. It may have been a material consideration with the purchaser, inducing him to make the purchase, that he was allowed to retain to himself and for his own benefit, such portion of the purchase money as his wife could have claimed in an equal division among the children living at the death of their mother. As will be observed, the reservation is to the husband himself alone, and not to the wife; and, according to the plain meaning of the terms employed, construed in reference to the law as it then stood, in regard to the marital

rights of the husband, it is manifest that no right of survivorship was contemplated in the wife. If Hobbs had retained the land, and, on the death of Mrs. Ringgold, in 1870, had paid the other children their proportion of the purchase money, it could hardly be contended that the portion reserved to himself would still be a charge upon the land, dependent upon the survivorship of the wife. At the death of Mrs. Ringgold, the proportion of the purchase money that Hobbs was entitled to retain was one-fourth ; and as from the time of the death of Mrs. Pratt, one of the children, in 1854, without issue, Hobbs was *personally* discharged from that proportion of the principal of the purchase money, the land stood also discharged to that extent ; though both Hobbs and the land remained still bound for the interest on that portion until the death of Mrs. Ringgold, in 1870.

4. We come now to a question of considerable importance in these cases, and that is, in what condition of the land is dower to be assigned ; —whether according to the improved value at the time of assignment, or at the death of the husband, or in such manner as to exclude the value of the substantial improvements placed upon the land since the sheriff's sale in 1844 ?

It is shown in proof that the land has been divided and sold out in different parcels, and that it all has been considerably improved. Buildings have been erected, and the productive quality of the land has been greatly increased by the application of manures and fertilizers ; and the question is, whether the demandant is to have the benefit of these improvements in the assignment of her dower?

As against the heir, there is no question but that the widow is entitled to dower according to the value of the land at the time of the assignment, *Co. Litt.*, 32, *a ;* but as against an alienee, the rule in this country differs from that established in England by the more modern authorities.

In the case of *Riddell vs. Gwinnell,* 1 *Q. B.,* 682, it seems to be settled in England, that the same rule that applies as between the widow and the heir should apply as between the widow and the alienee, and by that rule the widow gets the benefit of all improvements made by the alienee subsequent to the time when the husband parted with his estate; though it seems to have been conceded in that case that the older authorities gave sanction to the rule, whereby the widow would be excluded from the benefit of such improvements. In this country, however, the rule is settled by overwhelming authority, that, as against an alienee, the widow is not to be allowed the benefit of the improvements made by the alienee; and the true rule, deducible from the authorities, and as stated by Chancellor KENT, would seem to be "that the improved value of the land, from which the widow is to be excluded, in the assignment of her dower, as against a purchaser from her husband, is that which has arisen from the actual labor and money of the owner, and not from that which has arisen from extrinsic or general causes." 4 *Kent's Com.,* 68; *Thompson vs. Morrow,* 5 *Sergt. & Rawle,* 289; *Powell vs. Mon. & Brimf. Man. Co.,* 3 *Mason,* 347, 373-5; *Dunseth vs. Bank U. S.,* 6 *Ohio Rep.,* 76; *Gore vs. Brazier,* 3 *Mass.,* 544; and 2 *Scrib. on Dow.,* 576-7-8, *and* 588-9, where the authorities are collected. But to give full effect to this rule, after excluding all the improvements made by the alienee, before demand of assignment, the assignment of the dower should be made according to the value of the land at the time of assignment; and this was the conclusion in the cases to which we have referred. The reason of the distinction between the case of the heir and that of the alienee is not material to be stated here; but it is most obvious that if the widow should be allowed the full benefit of all the improvements placed upon the land by the alienee, from the time of alienation to the time of the assignment of dower, such

principle would operate greatly to discourage and restrain the improvement of land, as it would also lessen its vendible value.    Therefore, as matter of policy, as well as upon the reason and justice of the thing, the American doctrine would seem to be well founded.

The question as here presented has never been considered and determined in any previous case by this Court. In the case of *Sellman vs. Bowen*, 8 *Gill & John.*, 50, which was a bill against an alienee for an account of rents and profits, after a recovery of dower at law, the Court said, in the conclusion of its opinion, that the account would be taken from the time of the demand made, and that the rents and profits were to be estimated according to the improved value of the premises.    But there was no question in that case in regard to improvements made prior to the complete accrual of the right of dower, nor does it appear that any such question was either suggested by the counsel or discussed by the Court.    Nor has that case been considered as settling any rule in reference to this particular question ; for we find Chancellor JOHNSON, in the case of *Bowie vs. Berry*, 1 *Md. Ch. Dec.*, 452, and again, in the same case, in 3 *Md. Ch. Dec.*, 359, after careful consideration, as he himself states, adopting the rule stated by Chancellor KENT ; and the correctness of that decision has never been questioned either on appeal or otherwise.

It has been suggested by counsel, that inasmuch as Valentine Bryan was a purchaser of the land at sheriff's sale, and not directly from Hobbs, he cannot therefore be regarded as an alienee within the rule just stated ; but that suggestion cannot be sustained.    It has been expressly held, that a purchaser under execution occupies the same position, in regard to improvements made by him, as he would do if the land had been directly conveyed to him by the husband.    *Ayer vs. Spring*, 9 *Mass.*, 8 ; 2 *Scrib. on Dow.*, 579.

5. The last question is as to the damages to which the demandant may be entitled for the detention of her dower.

At the common law, when dower was detained from the widow, and she was compelled to resort to her writ of dower, she could recover no damages for the detention, but was entitled only to the profits of her third part of the land from the time of judgment recovered. To remedy this defect in the law, the *Statute of Merton*, 20 *Hen.* 3, c. 1, (*Alex. Brit. St.*,) was passed, which gave the demandant damages equal to the value of her dower from the time of her husband's death, or, by construction, from the time of demand made, *Co. Litt.*, 32, *b;* but that statute, by its express terms, only applies where the husband *died seized.* In those cases, therefore, where the husband does not die seized, as where the land is alienated in his lifetime, there can be no recovery of damages at law. 1 *Roper, H. & W.*, 440; *Sellman vs. Bowen,* 8 *Gill & John.*, 50. But in equity, the widow may have a decree for an account of rents and profits against the alienee, or those claiming under him, which accrue after dower demanded; and she may even proceed in equity for such rents and profits after she has recovered her dower at law. *Sellman vs. Bowen,* 8 *Gill & John.*, 50; *Kiddall vs. Trimble,* 1 *Md. Ch. Dec.*, 143, and same case affirmed in 8 *Gill*, 207; *Darnell and Wife vs. Hill,* 12 *G. & J.*, 388. To whatever damages therefore the demandant may be entitled, she can only recover them as an equitable demand.

It follows from what has been said in regard to these cases, that the *pro forma* judgments entered by the Court below, whereby it was adjudged that the demandant recover seisin of one-third part of the lands and tenements mentioned in the declarations, to be assigned by metes and bounds, as and for her dower, must, under the agreement of submission, be reversed; and the record will be remanded that the proper judgments be entered.

(See *Humphrey vs. Phinney*, 2 *John.*, 484.) But inasmuch as no judgments at law can be entered to embrace and give force to all the principles and rights determined in the foregoing opinion, it may be necessary, if the parties do not think proper to adjust all matters and conclusions of fact by agreement, that an amicable bill in equity be filed, so that a decree may be entered, and accounts taken, that will embrace the whole case, and thus put an end to controversy, in accordance with the spirit and intent of the agreement under which the *pro forma* judgments were entered, and this Court asked to review them.

*Judgments reversed, and
record remanded.*

(Decided December 6th, 1877.)